IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KEVIN E. CLARKE,<br><br>    Petitioner,<br><br>  v.<br><br>VICTOR M. ALMAGER, Warden,<br><br>    Respondent.<br>_____/ | No. 08-02890 CW<br><br>ORDER DENYING<br>PETITION FOR WRIT<br>OF HABEAS CORPUS |

On June 9, 2008, Petitioner Kevin E. Clarke, a state prisoner incarcerated at Centinela State Prison, filed a petition for a writ of habeas corpus claiming ineffective assistance of counsel.  On April 17, 2009, Respondent filed an answer.  Petitioner has not filed a traverse.  Having considered all of the papers filed by the parties, the Court DENIES the petition.

                                BACKGROUND

The following is a summary of the facts taken from the March 22, 2007 state appellate court's unpublished opinion on direct appeal.  Resp's Ex. B, People v. Clarke, A112245 (Cal. App. Ct.

March 22, 2007).

On April 10, 2003, at about 7 p.m., Kenneth Hamel was shot to death in his apartment. On the same evening, Katie Williams, age seventy-one, was sitting on her couch in her apartment next door to Hamel, when she was shot by a bullet that came through the wall separating her apartment from Hamel's. At the crime scene, investigators found an unfired 9 millimeter round of ammunition on Hamel's apartment floor, and a bullet hole in the wall adjacent to Williams' apartment. They also found 271 grams of marijuana, fifty-three grams of cocaine, a scale, other drug paraphernalia and several thousand dollars in cash. A 9 millimeter handgun was found behind the couch. An autopsy revealed that Hamel had been shot with four bullets. Williams sustained a single, potentially lethal gunshot wound to the abdomen.

Petitioner was a friend of Erika Geilfuss and William Mines, who lived together in American Canyon, California. Petitioner had introduced them to his friend, Brian Parker, who had recently been released from prison after serving a term for manslaughter.

On the evening of April 10, 2003, Petitioner and Parker arrived at Geilfuss' house. Petitioner had a gun and told Geilfuss that "everything went bad" during a robbery, and "they had to . . . kill somebody." Petitioner explained to Geilfuss that he and Parker planned a robbery, and that Parker had shot the intended target several times when the man produced a gun. Petitioner's gun had gotten jammed. Petitioner said that they had expected to collect about $90,000, but instead only collected twenty seven dollars.

Geilfuss later saw a "new hole" in her backyard and became suspicious that the murder weapon was buried there. She contacted Detective Craig Denton who supervised the recovery of a .357 handgun from Geilfuss' backyard.

At Parker's request, Mines had buried the .357 handgun, which he was told was the murder weapon, in the backyard of the house he shared with Geilfuss. Mines hid Petitioner's 9 millimeter gun in a safe in the house.

After retrieving the gun from the backyard, the police contacted Mines. Mines negotiated a plea agreement in which he was promised no prison time in exchange for entering a no contest plea to the charge of accessory after the fact of a murder, for burying the gun in the backyard, and for his full and truthful cooperation in subsequent prosecutions. Thereafter, Mines admitted that, a few days before April 10, 2003, Parker and Petitioner had asked him to participate in a robbery of a drug dealer. They told Mines that they would be armed, and that he should bring a shotgun. Mines agreed to participate, but Parker decided he did not know him well enough to include him.

Geilfuss, Mines and another witness testified that Petitioner appeared to be under the influence of heroin and alcohol on the night of April 10, 2003.

On June 30, 2003, after Petitioner was arrested, he gave a videotaped interview that was later played for the jury. Petitioner admitted to agreeing to help Parker rob a drug dealer. On the morning of April 10, 2003, Petitioner drove Parker to Palo Alto in Parker's car to collect money from certain people. They

3

1  stopped at five to eight places.  Their second to last stop was at
2  the apartment of James Miller, where they obtained two guns: a
3  revolver and a 9 millimeter.  When they arrived at Hamel's
4  apartment, Parker put on a ski mask and took out the revolver.
5  Petitioner had the 9 millimeter.  Petitioner knocked on the door.
6  Parker started firing the gun soon after entering the apartment,
7  when he saw that Hamel had a gun.  A second man who was present in
8  the apartment ran into the kitchen.  Petitioner was scared.  He
9  pulled out the 9 millimeter and found a bullet sticking out of it.
10 He racked the gun, and the bullet fell out.  After hearing a third
11 shot, Petitioner put the gun back into his waistband and left the
12 apartment.  Parker was still firing, but must have left the
13 apartment soon after Petitioner.  Petitioner described what
14 happened as "a robbery gone bad."

15      At his trial, Petitioner's testimony differed from the
16 statements he had made in his interview with the police.  He
17 testified that he was "coming down off of heroin" when he gave the
18 taped statement to the police.  Petitioner testified that, on April
19 10, 2003, Parker asked him to help collect money from various
20 people.  Parker never told Petitioner that he intended to commit a
21 robbery.  Petitioner testified that he suspected that Parker
22 entered Hamel's apartment intending to kill Hamel and had "no idea"
23 why Parker took him along.

24      Petitioner testified that he had never fired a gun before
25 April 10, 2003, and was not familiar with how to operate one,
26 although, when Petitioner and Parker stopped at Miller's apartment,
27 Miller gave Petitioner the 9 millimeter and told him it was ready

4

for firing.  After they left Miller's apartment, Petitioner thought he and Parker were going to Hamel's apartment to collect money, and was too high to consider why he would need a gun.

When they arrived at Hamel's apartment, Petitioner knocked on the door, and Parker put on a mask and began firing as soon as he entered.  Petitioner entered the apartment and crouched down at the kitchen counter.  He saw another person in the kitchen, but did not see drugs or money.  Petitioner pulled out the 9 millimeter that was in his waistband to "protect" himself, and saw a cartridge "stuck in it."  He caused the stuck cartridge to fall out.  He never intended to shoot anyone and did not attempt to shoot the weapon after freeing the stuck bullet.

Petitioner denied telling Geilfuss or anyone else that he had taken money from Hamel's apartment or that a robbery had gone bad. He testified that he told the police that during his June 30, 2003 interview because he believed that was what they wanted to hear. Petitioner really believed that Parker had been hired to murder Hamel.

On October 3, 2005, a jury found Petitioner guilty of murder with the special circumstance of committing murder while engaged in the commission or attempted commission of robbery and burglary. The jury also found Petitioner guilty of attempted robbery, burglary, shooting a firearm at an inhabited dwelling, assault with a firearm, and firearm possession by a felon.  The jury found true that Petitioner was armed in connection with all offenses, (except the firearm possession offense, because an element of that offense is being armed), that he had previously been convicted of a serious

5

felony and that he had served a prison term. The trial court sentenced Petitioner to life without the possibility of parole plus fourteen years.

Petitioner appealed on the ground of ineffective assistance of counsel. On March 22, 2007, in an unpublished decision, the court of appeal modified the judgment by striking a one-year enhancement, and otherwise affirmed the judgment. On June 13, 2007, the California Supreme Court denied review.

## LEGAL STANDARD

A federal court may entertain a habeas petition from a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). Under the Antiterrorism and Effective Death Penalty Act (AEDPA), a district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A decision is contrary to clearly established federal law if it fails to apply the correct controlling authority, or if it applies the controlling authority to a case involving facts materially indistinguishable from those in a controlling case, but nonetheless reaches a different result. Clark v. Murphy, 331 F.3d

1062, 1067 (9th. Cir. 2003). A decision is an unreasonable application of federal law if the state court identifies the correct legal principle but unreasonably applies it to the facts of the prisoner's case. Id.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is the holdings of the Supreme Court as of the time of the relevant state court decision. Williams v. Taylor, 529 U.S. 362, 412 (2000).

To determine whether the state court's decision is contrary to, or involved an unreasonable application of, clearly established law, a federal court looks to the decision of the highest state court that addressed the merits of a petitioner's claim in a reasoned decision. LaJoie v. Thompson, 217 F.3d 663, 669 n.7 (9th Cir. 2000). In the present case, the only state court to address the merits of Petitioner's claim is the California appellate court on direct review.

DISCUSSION

Petitioner claims he received ineffective assistance of counsel because (1) his counsel failed to respond to the prosecutor's statements in closing argument that Petitioner fired the bullet that went through the wall and hit Ms. Williams; and (2) his counsel failed to object on grounds of prosecutorial misconduct to other statements in the prosecutor's closing argument.

A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth Amendment right to counsel, which guarantees not only assistance, but effective assistance of

7

counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id.

To prevail under Strickland, a petitioner must pass a two-prong test. First, the petitioner must show that counsel's performance was deficient in a way that falls below an objectively reasonable standard. Id. at 687-88. Second, the petitioner must show that the deficiency prejudiced him. Id. at 687. The first prong of Strickland requires a showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment. Id. Judicial scrutiny of counsel's performance must be highly deferential, and a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Id. at 689; Wildman v. Johnson, 261 F.3d 832, 838 (9th Cir. 2001). A difference of opinion as to trial tactics does not constitute denial of effective assistance, United States v. Mayo, 646 F.2d 369, 375 (9th Cir. 1981), and tactical decisions are not ineffective assistance simply because in retrospect better tactics are known to have been available. Bashor v. Risley, 730 F.2d 1228, 1241 (9th Cir. 1984). Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. Sanders v. Ratelle, 21 F.3d 1446, 1456

(9th Cir. 1994).

Under <u>Strickland</u>'s second prong, the petitioner must show that counsel's errors were so serious as to deprive him of a fair trial, a trial whose result is reliable. <u>Strickland</u>, 466 U.S. at 688. The test for prejudice is not outcome-determinative, i.e., the petitioner need not show that the deficient conduct more likely than not altered the outcome of the case; however, a simple showing that the defense was impaired is also not sufficient. <u>Id.</u> at 693. The petitioner must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different; a reasonable probability is a probability sufficient to undermine confidence in the outcome. <u>Id.</u> at 694. It is unnecessary for a federal court considering an ineffective assistance of counsel claim to address the prejudice prong of the <u>Strickland</u> test if the petitioner cannot even establish incompetence under the first prong. <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir.), <u>cert. denied</u>, 525 U.S. 839 (1998).

I. Prosecutor's Argument that Petitioner Shot Ms. Williams

    A. State Court Opinion

    The state appellate court addressed this issue as follows.

> Near the beginning of his closing argument, the prosecutor stated: "This Defendant is charged with that which he admitted on the videotape and told the other folks. He is not charged with firing a bullet into the body of Mr. Hamel. He is not charged with firing a gun at all. He is not charged with having a gun that works, although I believe that -- I will argue to you that the evidence shows that his participation included having a gun that works. And I would suggest to you that the evidence shows that he was the one that put the bullet in poor Ms. Williams, minding her own business next door.

9

But regardless of that, in order to decide these charges, those are not things you have to decide.  Those are not things that you have to decide."

Later, the prosecutor stated: "Who put the bullet through the wall into Katie Williams, the Defendant did.  Of course the Defendant did.  Of course the Defendant did, that's how he his [sic] jammed.  That's how his gun jammed."

In arguing ineffective assistance of counsel, appellant suggests the prosecutor's statements were contrary to the undisputed evidence that he did not shoot Ms. Williams. He points to his own testimony and statements to the police and to his friends . . . that he never fired the 9 millimeter and that the gun was inoperable.  He also points out he was not charged with personally inflicting great bodily injury upon Ms. Williams, or with firearm <u>use</u> enhancements; rather, he was charged with firearm <u>arming</u> enhancements. [Emphasis in original].

We agree appellant's trial counsel failed to directly address in closing argument the prosecutor's suggestion that the evidence was consistent with appellant firing the shot that hit Ms. Williams.  Nonetheless, appellant's trial counsel did strongly argue to the jury the defense's theory of the case - - that Hamel's murder was not a "robbery gone bad" but a murder-for-hire by Parker of which appellant was unaware.  Consistent with that theory, appellant's trial counsel directed the jury to evidence that, among other things, Parker received two guns from Miller just before going to Hamel's apartment, their last stop of the day; that Parker began shooting as soon as he entered Hamel's apartment; that another person present at Hamel's apartment was left unharmed; and that drugs and money in plain view in Hamel's apartment were not taken.  Appellant's trial counsel also pointed out that appellant was inexperienced with guns, and was "loaded" on drugs and alcohol, incapable of forming the requisite specific intent to commit robbery or burglary, on the night of the crime.  He suggested that appellant told police it was a "robbery gone bad" only because he hoped to get a sweetheart deal from police and because he feared Parker.

We conclude that considered as a whole, appellant's trial counsel's argument was adequate.  While perhaps his argument would have been more effective had he responded to the prosecutor's belated claim that appellant may have shot Ms. Williams, it was not rendered ineffective by omission.  Moreover, while we can only speculate on this record why counsel failed to respond to the argument, we cannot conclude his failure had no rational tactical

10

> purpose as the law requires.  For example, counsel may have preferred to focus on what he deemed the more critical issue in the case -- appellant's lack of intent to commit robbery or burglary -- rather than to engage in a point-by-point rebuttal to the prosecutor's argument. . . .
>
> Even were we to conclude, however, that appellant's trial counsel unreasonably failed to respond to the prosecutor's suggestion that appellant may have shot Ms. Williams, we would find no resulting prejudice to appellant.
>
> Under the law of felony murder, the jury could have found appellant guilty of aiding and abetting regardless of whether he fired the bullet that hit Ms. Williams.  As the trial court correctly instructed the jury: "If a human being is killed by any one of several persons engaged in the commission or attempted commission of the crime of burglary and/or robbery, all persons who either directly and actively commit the act constituting that crime or who with knowledge of the unlawful purpose of the perpetrator of the crime, and with the intent or purpose of committing, encouraging or facilitating the commission of the offense, aid, promote, encourage or instigate by act or advice its commission are guilty of murder of the first degree whether the killing is unintentional or accidental."
>
> Consistent with that instruction, the prosecutor later explained to the jury: "Robbery, burglary, once those crimes have been found or either one of them, then the death that occurred inside is necessarily a murder of the first degree, as to Mr. Clarke whether he pulled a trigger or not.  Whether he pulled a trigger or not."  The evidence supported the commission or attempted commission of those crimes.  Testimony from several witnesses, including Ms. Geilfuss, Mr. Mines, and Ms. Martin, corroborated appellant's statements to police that he was engaged in a "robbery gone bad" that had been planned prior to April 10, 2003.  Moreover, appellant's own testimony proved he knocked on Mr. Hamel's door, armed with a gun and in the voluntary company of Parker, a convicted murderer who was armed and wearing a mask.  Given that evidence, there was no "reasonable probability" that but for trial counsel's failure to address the issue of who shot Ms. Williams in closing argument, appellant would have received a more favorable result.

Resp's Ex. B, People v. Clarke, A112245 at 9-12.

11

B. Analysis

As indicated above, under <u>Strickland</u>, for an attorney's performance to be deficient, he must have made errors that were so serious as to undermine the proper functioning of the adversarial process such that the result of the proceeding cannot be relied upon.  The appellate court properly applied this principle and reasonably concluded that, even though counsel failed to respond to the prosecutor's suggestion that Petitioner shot Ms. Williams, his argument was adequate.  Furthermore, as the appellate court suggested, counsel may have tactically omitted this issue so that he could spend more time focusing on the critical defense issue of Petitioner's lack of intent to commit a robbery or burglary.

The state court also properly applied <u>Strickland</u>'s prejudice prong.  The jury was instructed on the law of felony murder, which provides that, once an individual decides to participate in a crime such as robbery or burglary, he is responsible for any murder that occurs within the course of that crime.  As the appellate court pointed out, the evidence supported the finding that Petitioner intended to commit or to aid and abet the commission of the burglary or robbery of Hamel.  Thus, whether Petitioner shot Ms. Williams was not relevant to whether the jury found that Petitioner was guilty of the murder of Hamel.  Therefore, the appellate court reasonably concluded that there was no reasonable probability that, but for trial counsel's failure, in his closing argument, to address the issue of who shot Ms. Williams, Petitioner would have received a more favorable result.

The appellate court's denial of this claim of ineffective

assistance of counsel was not contrary to or an unreasonable application of established Supreme Court authority.

II. Failure to Object to Prosecutor's Alleged Misconduct

    A. State Court Opinion

    The state appellate court addressed this issue as follows.

> Appellant contends his trial counsel further rendered ineffective assistance by failing to object on proper grounds to the following statement by the prosecutor in closing argument: "I talk a lot about the fact that you took an oath, that's the law, you got to follow it.  I respectfully hope and fervently hope that no one would be tempted to disregard it.  But consider this, we just, we can't have this kind of behavior.  We just can't.  You can't live in a society where some very nice 71-year old lady is sitting on her couch and catches a bullet because these people choose to behave in this fashion.  We cannot have a society where someone like Mr. Hamel, whatever you think and the fact that he might have been selling marijuana, he's shot to death in his own home for money, for stupidity.  We just can't tolerate this behavior, and the law is very, very, very, very clear as to how the jury are [sic] to treat it."
>
> Following the prosecutor's statement, appellant's trial counsel interrupted with this objection: "Your Honor, this is not rebuttal anymore."  The trial court overruled his objection.  Appellant argues his trial counsel was deficient in failing to object to the statement on grounds of prosecutorial misconduct.  He reasons that the prosecutor, by "insert[ing] a 'but,' before launching into his diatribe concerning what 'we can't have' in our society," misstated the law and intended to arouse the passion or prejudice of the jury.  We disagree.
>
> Putting aside the law regarding the effectiveness of assistance from counsel, we conclude the prosecutor's statement was within the realm of appropriate argument.  The prosecutor repeatedly advised the jurors of their obligation to follow the law.  For example, soon after making the above statement that appellant claims was prosecutorial misconduct, the prosecutor told jurors: "In fulfillment of your oath, I ask you based on this evidence to do no more, but certainly no less than the law requires."  Moreover, the trial court instructed the jury that counsel's statements are not evidence, and that they are duty-bound to follow the law.  Specifically, the trial court stated: "If anything concerning the law said by the attorneys in their arguments or at any other time

13

> during the trial conflicts with my instructions on the law, you must follow my instructions." In this context, we conclude no reasonable jury would have interpreted the prosecutor's use of the word "but" before this statement that society should not tolerate "this kind of behavior" as an invitation to disregard the law. . . .
>
> Because the prosecutor's statement was not misconduct, the failure to object to it did not amount to ineffective assistance by appellant's counsel. We thus need not address whether his failure to object was prejudicial to appellant.

Resp's Ex. B, People v. Clarke, A112245 at 12-13.

B. Analysis

It is improper for a prosecutor to express his or her opinion of the seriousness of the defendant's crime to the jury. United States v. Young, 470 U.S. 1, 18-19 (1985); United States v. McKoy, 771 F.2d 1207, 1211 (9th Cir. 1985). The concern is that this might convey to the jury that there is evidence that was not presented to the jury, but is known to the prosecutor, or that the jury might view the prosecutor's statements as carrying the endorsement of the government and, as a result, might defer to the prosecutor's assessment rather than its own analysis of the evidence. Young, 470 U.S. at 18-19. However, counsel are permitted latitude in their presentation of closing summations, and unless the improprieties are so gross as to prejudice the defendant, and the prejudice has not been neutralized by the trial judge, a new trial is not required. United States v. Potter, 616 F.2d 384, 391-92 (9th Cir. 1979).

Although the prosecutor communicated to the jury his opinion of the seriousness of the crime, his comments were based on evidence that had been presented to the jury; he did not give the

14

impression that he was relying on evidence that had not been presented in the courtroom. The prosecutor did not suggest that the jurors disregard their oath. Rather, as the state court noted, the prosecutor himself told the jurors to review the evidence and to follow the law and the trial court instructed the jurors that counsel's statements were not evidence and that they were bound to follow the law. This admonishment neutralized any prejudice caused by the prosecutor's statements. Although the state court did not specifically apply federal authority in determining that there was no prosecutorial misconduct, its analysis is in accord with the above-cited authority. Because there was no prosecutorial misconduct, counsel's failure to object on this ground did not constitute deficient performance.

Furthermore, even if counsel's failure to object on the ground of prosecutorial misconduct was deficient, there was no resulting prejudice. As discussed previously, to prove that Petitioner was guilty of murder under the law of felony murder, the prosecutor was only required to establish that Petitioner took part in or aided and abetted a burglary or robbery, and that Hamel's murder took place within the course of that burglary or robbery. The evidence that Petitioner participated in or aided or abetted a burglary or robbery was very strong and there was little doubt that Hamel was murdered during the course of that crime. Therefore, Petitioner has not shown that there is a reasonable probability that, but for counsel's failure to object on the grounds of prosecutorial misconduct, the result of the proceeding would have been different.

15

The state court's denial of this claim was not contrary to or an unreasonable application of established federal authority.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is denied. The Clerk of the Court shall enter judgment and close the file.

IT IS SO ORDERED.

DATED: July 22, 2010    

CLAUDIA WILKEN
United States District Judge

16